IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 15-01465-TUC-CKJ(EJM) |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| Arnoldo Saavedra Chavira, | |
| Defendant. | |

Pending before the Court are the defendant's motion to dismiss the indictment based on outrageous government conduct (Doc. 32) and a motion to suppress statements and evidence (Doc. 31).  For the reasons stated below, the undersigned recommends that the District Court deny both motions.

**I.    The Pending Charges**

On July 16, 2015, the defendant was arrested and charged with bulk cash smuggling in violation of 31 U.S.C. § 5332.  (Doc. 1). The criminal complaint alleges that, on this date, the defendant knowingly concealed more than $76,000 while attempting to leave the United States and enter the Republic of Mexico at the Port of Entry in Nogales, Arizona. The defendant initially denied that he and the juvenile accompanying him had more than $10,000 in currency in their possession or in their vehicle. However, at the secondary inspection area the defendant claimed that he had $6,500 and the juvenile had $8,000. The juvenile's purse did contain $8,000, but the defendant had bundles of currency taped to his legs that totaled far more than $6,500. In a post-Miranda interview, the defendant stated that he was transporting the money to his grandfather in Mexico, and that he obtained the money from

a person named Juan Carlos. The defendant said he failed to declare the money because he thought it was illegal to transport more than $10,000 out of the United States and that he had been told not to declare the currency.

On August 12, 2015, a federal grand jury in Tucson, Arizona, returned a two-count indictment against the defendant charging him with violations of  31 U.S.C. § 5332 (Bulk Cash Smuggling) and 31 U.S.C. § 5324 (Evading Reporting Requirements). (Doc. 12). The indictment also contained  a forfeiture allegation against the currency seized at the time of the defendant's arrest.[1]

## II.    **The Pending Motions**

The motion to dismiss the indictment based on outrageous government conduct stems from how federal law enforcement officers allegedly treated the defendant and his juvenile sister both before and after their arrest. (Doc. 32). With respect to the juvenile, the defendant claims that government agents violated the Juvenile Delinquency Act ("JDA") in detaining the juvenile for a prolonged period of time without advising her of her legal rights and immediately notifying her parents that she was in custody and the nature of the alleged offense. The defendant also alleges that agents threatened to charge his juvenile sister with a crime if the defendant did not speak to law enforcement, and that U.S. Customs and Border Protection ("CBP") officers humiliated him both by telling his sister about his private medical condition that he voluntarily disclosed to the agents for their safety, and by making fun of his medical condition.

The motion to suppress similarly alleges that the defendant's statements to law enforcement were involuntary because he was coerced into waiving his rights based on the threat to charge his juvenile sister, and because the agents violated his sister's rights under the JDA. (Doc. 31). The motion to suppress also alleges that the search of the juvenile's purse and the pat down of the defendant were unreasonable under the Fourth Amendment because law enforcement did not have probable cause or a reasonable suspicion that the

---

[1] The juvenile was not charged with an Act of Juvenile Delinquency.

defendant and/or his sister were engaging in criminal activity.

**III.    The Evidentiary Hearing**

An evidentiary hearing on these motions was held on April 14, 2016 and April 22, 2016.[2] The government called three witnesses: CBP Officer Sony Bun; CBP Officer Adrian Morales; and Border Patrol Agent Julio Barajas. The defense called the following witnesses: the defendant's juvenile sister; the defendant's mother, Leticia Saavedra; and the defendant.

**A.    Government Witnesses:**

**1.    CBP Officer Bun**

Officer Bun testified that on July 16, 2015, he was working the outbound vehicle lane at the DeConcini Port of Entry in Nogales, Arizona. (4/14/16 Tr. at 9.)  At about 3:30 p.m. that day, he encountered the defendant and a female passenger (later identified as the defendant's juvenile sister) who were attempting to exit the United States in a Toyota Corolla. *Id.* Officer Bun waved for the defendant to stop his vehicle and approached the driver's side window to speak with the defendant. *Id.* Officer Bun asked the defendant where he was coming from and where he was going. *Id.* at 10-11. The defendant said that he was coming from Phoenix and was headed to Sonora, Mexico. *Id.* Officer Bun asked the defendant if he or the female passenger had any weapons, ammunition, or currency in excess of $10,000 to declare. *Id.* at 11-12. Officer Bun explained that he asked these questions as part of his job duties, as he is tasked with ensuring that these items are declared prior to an individual leaving the United States and entering Mexico. *Id.* at 11. The defendant told Officer Bun that he did not have weapons, ammunition, or currency in excess of $10,000. *Id.* at 12.  The female passenger also said that she did not have any of these items to declare. *Id.* at 13.

Officer Bun noticed that the female in the passenger seat had a purse either on her lap or on the floor and asked for permission to search the purse. *Id.* at 12-13. According to Officer Bun, the female passenger handed him the purse, which he opened and found two

---

[2] References to "4/14/16 Tr." and "4/22/16 Tr." followed by a page number are to the transcripts of the evidentiary hearing conducted on these respective dates.

sealed envelopes. *Id.* at 13. Officer Bun asked: "what is this?" *Id.* The defendant responded "it's money." *Id.* Officer Bun then requested identification from both the defendant and the female, and they both provided their passports. *Id.* at 14. At that time, Officer Bun did not "do the calculation in [his] head as to the ages of the car's occupants." *Id.* Officer Bun told the defendant to drive the car to the secondary inspection area and the defendant complied with that request. *Id.*

At the secondary inspection area, Officer Bun handed the passports to his colleague, CBP Officer Adrian Morales, who asked the defendant to step out of the vehicle. *Id.* at 15-16. Officer Morales conducted a pat down of the defendant to check for weapons. *Id.* at 16. Officer Morales discovered "something" around the defendant's ankles and inner thigh, and placed the defendant in handcuffs. *Id.* According to Officer Bun, the female passenger was not placed in handcuffs at any time while he was in her presence and she stayed with Officer Bun "the whole time from the vehicle all the way to our secondary inspection in the building." *Id.* Officer Bun testified that he stayed with the female in a waiting area for about 30 minutes until a female officer was available to conduct a pat down of the female passenger. *Id.* at 16-17. Officer Bun was not present for that pat down because it occurred in an adjacent room. *Id.* at 17. Officer Bun had no other contact with the defendant or the female, but did assist in the count of the seized currency. *Id.* at 17-19.

On cross examination, Officer Bun testified that July 16, 2015 was "a slow night" in terms of vehicles exiting the United States, so that is why he decided to stop the defendant's vehicle at the Port of Entry. *Id.* at 20. He did not get a "tip" to be on the lookout for someone transporting money, nor was there anything suspicious about the defendant or his vehicle. *Id.* at 19-20. Officer Bun reiterated that he did not know that the female was a juvenile, but acknowledged that if he was aware of that fact he would have been required to notify his supervisor, who would "take over." *Id.* at 21-24. When asked why he would not simply tell someone trying to exit the United States "have a nice day," when they say they have nothing to declare, Officer Bun testified that he can request to inspect the vehicle or items in the vehicle. *Id.* at 24. Officer Bun maintained that he asked for permission to look in the purse,

but could not specifically recall if the female handed the purse to him or if she handed it to the defendant who then handed it to Officer Bun. *Id.* at 24-25.

### 2. CBP Officer Morales

Officer Morales testified that on July 16, 2015, he was working in the secondary inspection area at the DeConcini Port of Entry in Nogales, Arizona. *Id.* at 31-32. On that day, Officer Bun referred the defendant and his vehicle for a secondary inspection. *Id.* at 32, 34-35. Officer Morales advised the defendant to turn off the vehicle, explained the currency reporting requirements, asked if the defendant or the female passenger had any currency, guns, or ammunition to declare, and advised them that the vehicle was going to be inspected. *Id.* at 35-36. Officer Morales asked the defendant to step out of the vehicle and conducted a pat down for officer safety. *Id.* at 36-37. Officer Morales discovered what felt like bundles of currency taped to the defendant's inner thighs. *Id.* at 37-38. When Officer Morales asked the defendant what the bundles were, he stated "money." *Id.* at 38. Officer Morales placed the defendant in handcuffs for officer safety reasons. *Id.* at 38-39.  Officer Morales did not have any interaction with the female passenger, other than asking her if she had any items to declare. *Id.* at 39.

Officer Morales escorted the defendant into the building at the Port of Entry to conduct a more thorough pat down. *Id.* at 39-40. Once he obtained supervisory approval for the more thorough pat down, Officer Morales asked the defendant if he was taking any medications or had any medical conditions. *Id.* at 40-41. The defendant stated that he had a skin rash around his waist area which he believed may be contagious. *Id.* at 41-42. Officer Morales testified that officers use latex gloves for all thorough pat downs, and he used gloves to conduct the pat down of the defendant. *Id.* at 42. The thorough pat down of the defendant revealed currency bundles tucked within the defendant's socks and shoes, and taped around his thighs. *Id.* at 40-41.

On cross examination, Officer Morales testified that he did hear another officer make a remark about the defendant's skin condition. *Id.* at 44. He believes the comment was "I better cover up before I catch something," and he believes that Officer Bun made the

comment (because of his distinctive accent). *Id.* at 45-46. He testified that the defendant's response to that comment was "oh, that's messed up," and the defendant "seemed down." *Id.* at 46. Officer Morales told the other officers to keep it professional. *Id.* With respect to the initial pat down of the defendant, Officer Morales conceded that he did not ask for the defendant's consent to perform the pat down and testified that officers routinely conduct such pat downs for officer safety when an occupant exits a vehicle in secondary inspection. *Id.* at 49.

### 3. Border Patrol Agent Barajas

Border Patrol Agent Julio Barajas testified that on July 16, 2015 at about 3:45 p.m., he received a call to report to the DeConcini Port of Entry. *Id.* at 54-55. He estimates that he arrived at the Port of Entry around 4:15 p.m. *Id.* at 45. He testified that his standard practice is to talk with the officers involved in the incident at issue to get briefed on the circumstances that led to the detention. *Id.* His testimony was not clear on whether he spoke with all of the officers at the Port of Entry before or after they finished counting the seized currency, but he did recall that it took a while for the officers to count the currency. *Id.* at 56-57.

Agent Barajas first saw the defendant in the Passport Control Unit of the Port of Entry (because the holding cells were being remodeled). *Id.* at 57–59. He escorted the defendant to another room within the Port of Entry to conduct an interview. *Id.* at 60. Agent Barajas testified that he began his recorded interview of the defendant at around 6:00 p.m.[3] *Id.* at 56-57. After eliciting some biographical information, Agent Barajas had the defendant read aloud a pre-printed Miranda rights form. *Id.*; Exhibits 1 and 5. The defendant stated that he understood all of his rights and was willing to speak without a lawyer present. *Id.* at 60-62; Exhibit 1. The defendant also signed and initialed the rights waiver form indicating that he understood his rights and wanted to speak without counsel. *Id.* at 60-61; Exhibit 5. Agent Barajas testified that he never threatened the defendant or his sister with prosecution if he did

---

[3] The parties did not submit a transcript of the defendant's recorded interview. Instead, the government submitted a compact disk of the interview which this Court has reviewed (Exhibit 1).

not speak with law enforcement. *Id.* at 62. Agent Barajas does recall the defendant mentioning that CBP officers made fun of his skin condition, and he broke down when discussing that subject. *Id.* at 63. In addition to being upset about the comments, the defendant was upset about his skin condition generally and was worried about his mom and sister finding out about his skin condition. *Id.*

Agent Barajas then went to interview the defendant's sister. *Id.* at 63-64. During his biographical questioning, he realized she was only 16-years-old so he stopped his questioning. *Id.* at 64. Prior to that point, none of the CBP officers had told him that the defendant's sister was a juvenile. *Id.* Agent Barajas called the duty Assistant U.S. Attorney who advised him to call the juvenile's parents. *Id.* Agent Barajas called the juvenile's mother who did not allow the juvenile to be interviewed. Agent Barajas told the CBP officers that the juvenile was not going to be charged with a crime and that they should call her mother to come pick her up. *Id.* at 64-65.

On cross examination, Agent Barajas conceded that the tape recording of the defendant's interview does reflect that the defendant stated that his sister is 16-years-old. *Id.* at 70-71. Agent Barajas testified that he did not recall hearing that at the time, but the recording does reflect that the defendant said that during the interview. *Id.* at 71. Agent Barajas explained that he was likely distracted because he was doing other things, like looking at bank documents taken from the vehicle.[4] *Id.* Agent Barajas acknowledged that he did have a short unrecorded conversation with the defendant during the walk from the Passport Control Unit to the interview room. *Id.* at 75. During that conversation, the defendant expressed his concern for his sister, and Agent Barajas mentioned that the defendant's sister could be facing federal charges as well. *Id.*

---

[4] The audio recording of the defendant's interview reflects that another law enforcement officer present for the interview asked the defendant his sister's age, and the defendant said she was 17 years old. At that point, the second officer had been questioning the defendant for about ten to fifteen minutes. Agent Barajas had earlier asked this officer if he had questions for the defendant. Shortly after the defendant told the second officer his sister's age, Agent Barajas resumed the questioning and ultimately advised the defendant that he was going to be arrested and charged with a crime. (Exhibit 1.)

At the request of the prosecutor, Agent Barajas conducted follow-up interviews of Officer Bun and Officer Morales regarding the comments allegedly made by CBP officers about the defendant's skin condition. *Id.* at 75-77. Agent Barajas testified that Officer Morales said that he did not recall who made the comment about the defendant's skin condition. *Id.* at 75. Agent Barajas reported this comment to the CBP supervisor and left any investigation and/or discipline to him because that was not within Agent Barajas's job duties. *Id.* at 76. He believes the supervisor apologized to the defendant for the non-professional comments. *Id.* at 79. Agent Barajas also testified that Officer Bun told him that he looked at the passport when it was first provided to him and noticed that the defendant's sister was 16-years-old. *Id.* at 77.

### B.     Defense Witnesses:

#### 1. The Juvenile

The juvenile testified that she had a purse on her lap when she and her brother were stopped by Agent Bun at the Port of Entry. *Id.* at 82. She testified that the officer said "let me see your purse," but while he was saying that, he reached into the car and grabbed it. *Id.* She never gave the officer permission to search her purse nor did the officer ask her for permission to search it. *Id.* at 83. She testified that she was 16-years-old at the time of this incident and that the passport she provided to Officer Bun reflected her true date of birth. *Id.* at 82-83. After she was removed from the car at the secondary inspection area, she was placed into a holding cell and handcuffed whenever she was taken from the holding cell. *Id.* at 83-84. She asked agents what was going on and if she could call her mother, but officers did not respond to either inquiry, other than to say "don't worry about it." *Id.* at 83.

She further testified that she heard officers laughing at and joking about her brother. *Id.* at 86. They said "negative things" about him, specifically, that "he had an infection" and they "were going to burn the handcuffs." *Id.* She testified that they made these comments even though her brother was asking them not to tell her anything. *Id.* at 86-87. She testified that her brother was really embarrassed because this was a personal issue, and she had not known about his skin condition. *Id.* at 87. Officers then asked her if she had the same

1    infection. *Id.* at 86.

2         In response to the Court's question, the juvenile testified that she never told the

3    officers her age and only Agent Barajas asked her age. *Id.* at 90. She testified that eventually

4    the handcuffs were removed and she was put in another area to wait for her mother to pick

5    her up. *Id.* at 88-89.  She waited there for a couple of hours until her mother arrived and took

6    her home. *Id.*

7              **2.  The Defendant's Mother**

8         The defendant's mother, Leticia Saavedra, testified on direct examination as follows.

9    Between 7:00 p.m. and 8:00 p.m. on July 16, 2015, Ms. Saavedra received a call from her

10   juvenile daughter's cell phone; however, an agent was on the line. *Id.* at 92-93. The agent

11   asked for her permission to interview her daughter, and she responded that he could not

12   conduct an interview. *Id.* at 93-94. She testified that she was very upset because she had been

13   trying to get in touch with her children and felt the agents waited too long to call her to

14   explain what had happened. *Id.* at 93-94. She also testified that she told the agent that she

15   was going to retain an attorney for both of her children. *Id.* at 95.

16             **3.  The Defendant**

17        The defendant testified that on July 16, 2015, as he was attempting to leave the United

18   States and enter Mexico via the DeConcini Port of Entry, an officer waved for him to stop

19   his vehicle. (4/22/16 Tr. at 4-5.) The defendant was traveling with his juvenile sister. *Id.* at

20   6. The officer asked them where they were coming from and where were they going. *Id.* at

21   5. After they answered that question, the officer asked them if they had over $10,000 in

22   currency, weapons or drugs. *Id.* The officer asked to see the juvenile's purse at the same time

23   as he reached into the car for it. *Id.* at 5-6. The defendant testified that his sister's hands were

24   on the purse, and she never lifted her hands to hand the officer the purse. *Id.* at 6.

25        After the officer looked through the purse, he sent them to secondary inspection. *Id.*

26   The defendant testified that another officer asked him the same question about currency and

27   weapons, asked him to step out of the car and place his hands on the car, and then patted him

28   down. *Id.* at 6-7. The officer never asked permission to pat him down. *Id.* at 7. After the

officer found the currency, the defendant was handcuffed and taken to a holding cell. *Id.* As it became clear that the officers were going to search him further, the defendant noticed that the officer was not wearing gloves. *Id.* Out of a concern for the officer's safety, the defendant told the officers he had a skin condition that was still undiagnosed and could be contagious. *Id.* at 7-8. The officers backed away and said: "burn the handcuffs, burn the keys, get your HAZMAT suit, put a mask on, you're going to have to burn his clothes." *Id.* at 8. The defendant told the officers not to tell his sister about the skin condition, but they did so and asked his sister if she had the same infection. *Id.* at 8. The defendant said he thought about killing himself because of the comments made and because of his already weakened mental state stemming from the skin condition and the various medications being used to attempt to treat the condition. *Id.* at 8-9.

With respect to his post-arrest interview, the defendant testified that he had a five to ten minute unrecorded conversation with Agent Barajas. He testified that Agent Barajas said that "if I did not - if I didn't pretty much talk to them, that my sister would be facing the same thing that I'll be facing." *Id.* at 9. In response to defense counsel's request for clarification on the phrase "pretty much," the defendant testified "[i]t's just my way of saying - - his way of saying that if I don't talk to them, I mean, my sister's getting the same treatment that I'll be getting." *Id.* at 10. The defendant testified that these comments influenced his decision to talk with Agent Barajas. *Id.* The defendant explained that his mother has worked with attorneys for many years, and he knows not to talk with any officer without a parent or lawyer present. *Id.* He testified that he signed the rights waiver form because he was not going to let his sister go through the same thing he was going through. *Id.*

On cross examination, the defendant conceded that during the recorded portion of his interview, he never stated that he was only speaking with Agent Barajas because he was threatened and was trying to protect his sister. *Id.* at 13-14. Moreover, he testified that near the end of the interview he had a question about what was going to happen to his sister, and Agent Barajas explained what was going to happen - *i.e.*, that she was going to be interviewed as well. *Id.* at 14. The defendant conceded that at no point during the recorded

1  portion of his interview did he refer to Agent Barajas's alleged prior statements about how

2  the juvenile would be treated if the defendant did not speak with law enforcement. *Id.* at 14.

3  The defendant also admitted that he spoke with law enforcement after a prior DUI arrest, and

4  that no one coerced him to do so on that occasion. *Id.* at 16. But, he added that officers never

5  read him his Miranda rights prior to that conversation. *Id.*

6          **C.**    **Rebuttal Testimony**

7        The government recalled Agent Barajas to rebut the defendant's claim that his waiver

8  of his rights was involuntary because of Agent Barajas's comments about the treatment the

9  juvenile would receive if the defendant did not speak with law enforcement. Agent Barajas

10  testified that he would not have had an unrecorded ten-minute conversation with the

11  defendant prior to advising him of his Miranda rights. *Id.* at 26-27. Agent Barajas did testify

12  that it is certainly possible he had a conversation with the defendant on the walk from the

13  holding cell to the interview room, and it was possible that the defendant asked Agent

14  Barajas questions. *Id.* at 27. Agent Barajas does recall that the defendant was concerned

15  about his sister and, prior to the recorded interview, the defendant may have asked what was

16  going to happen to his sister. *Id.* But Agent Barajas testified that if the defendant did ask him

17  that question, he would have told the defendant that "it's an investigation, I do need to talk

18  to her." *Id.* Agent Barajas testified that he never told the defendant that if he did not talk to

19  law enforcement something bad would happen to his sister. *Id.*

20  **IV.**    <u>**Discussion**</u>

21        Both the motion to suppress evidence and statements and the motion to dismiss the

22  indictment are based on alleged unprofessional conduct of law enforcement, specifically, the

23  alleged mistreatment of the defendant and his juvenile sister by law enforcement officers at

24  the DeConcini Port of Entry. The behavior of some of the law enforcement officers involved

25  in the defendant's arrest may have been rude, impolite, and even childish, but that behavior

26  was not so outrageous as to justify dismissal of the indictment. Similarly, while it would have

27  been courteous to obtain the juvenile's consent to search her purse and to ask the defendant

28  for permission to conduct a pat down of his outer clothing, no consent or permission was

required under the border search doctrine. Finally, there is no evidence that the defendant's waiver of rights was involuntary because the defendant was offended by the CBP officers' insensitive comments about his skin condition and/or his (understandable) concerns that his sister was also likely going to be searched, interviewed, and potentially charged with a criminal offense.

### A. Motion to Dismiss the Indictment

The defendant moves to dismiss the indictment based on outrageous government conduct. The alleged outrageous conduct includes: (1) the JDA violations committed by the CBP officers in their arrest and detention of the defendant's sister; and (2) the humiliating treatment the defendant received when he told officers of his skin condition. The government argues that no JDA violation occurred, and even if the JDA was violated, the defendant has no standing to assert that violation. The government also argues that the defendant was more upset about his medical condition than the comments made by officers about his condition.

"Outrageous government conduct occurs when the actions of law enforcement officers . . .are 'so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction.'" *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013) (*quoting United States v. Russell*, 411 U.S. 423, 431-32 (1973)). "'For a due process dismissal, the [g]overnment's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013) (*quoting United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991)). This is an "extremely high standard." *Hullaby*, 736 F.3d at 1262. "Indeed, there are only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *Black*, 733 F.3d at 302.

Where outrageous government conduct is alleged, every case must be resolved on its own particular facts because there is no bright line dictating when law enforcement crosses the line between what is acceptable and what is outrageous. *Id.* That said, courts have identified various factors that are relevant to whether the government's conduct was outrageous: (1) known criminal characteristics of the defendant; (2) individualized suspicion

1    of the defendant; (3) the government's role in creating the crime of conviction; (4) the

2    government's encouragement of the defendant to commit the offense conduct; (5) the nature

3    of the government's participation in the offense conduct; and (6) the nature of the crime

4    being pursued and necessity for the actions taken in light of the nature of the criminal

5    enterprise at issue. *Id.* at 303.

6          The factors identified above stem from cases where the alleged outrageous

7    government conduct involved entrapment-type behavior, such as: engineering and directing

8    a criminal enterprise from start to finish; using excessive physical or mental coercion to

9    convince an individual to commit a crime; and generating new crimes merely for the sake of

10   pressing charges. Thus, these factors have little relevance to the instant claim of outrageous

11   government conduct where the government did not create and/or participate in the offense

12   conduct, or encourage the defendant to commit the offense conduct. Indeed, the defendant

13   does not cite to a case of alleged outrageous government conduct with facts remotely similar

14   to the case at hand. Again, that is likely because of the "extremely high standard" for

15   establishing outrageous government conduct warranting a due process dismissal of an

16   indictment.

17         Here, the alleged behavior of law enforcement may have been rude and offensive, but

18   it was not so outrageous as to justify dismissal of the indictment. The government may well

19   have violated the JDA by failing to timely ascertain the age of the defendant's sister and

20   detaining her for a prolonged period of time prior to contacting her mother. However, the

21   juvenile was not charged with a criminal offense, and the defendant has no standing to assert

22   a JDA violation on behalf of his sister. The defendant claims that had law enforcement

23   complied with the JDA and timely contacted his mother, he likely would not have waived

24   his Miranda rights because his mother told Agent Barajas that she was going to retain

25   lawyers for both of her children. However, as an adult, the defendant's mother could not have

26   invoked his right to remain silent. That decision was his, and his alone.

27         With respect to the comments made about the defendant's skin condition, those

28   comments were clearly hurtful and childish; indeed, they were comments you may expect

to hear from high school students in a locker room and not from law enforcement officers conducting a serious criminal investigation. But, again, these comments were not "so grossly shocking and so outrageous as to violate the universal sense of justice." The defendant's demeanor during the interview was calm until the defendant told Agent Barajas about the comments. (Exhibit 1.) The defendant was clearly upset by the comments, as he broke down and cried when describing the comments to Agent Barajas. However, the defendant was also upset about his skin condition generally, his family finding out about his skin condition, his legal situation, and about whether his sister might be charged with an offense. *Id.* After he composed himself, the defendant's demeanor was again calm and his will was not overborne as a result of the comments.

For all of these reasons, the undersigned recommends that the District Court deny the motion to dismiss the indictment.

## B.  Motion to Suppress Evidence

The defendant argues that the currency seized from him and his sister should be suppressed because the pat down of his outer clothing and the search of his sister's purse were not consensual and the agents did not have probable cause or reasonable suspicion to conduct those searches. The government argues that the border search doctrine renders these searches lawful regardless of whether the CBP officers obtained consent or had any suspicion that the defendant was engaged in criminal activity.

The Ninth Circuit has described the contours of the border search doctrine as follows:

> The border search doctrine is a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause. Under this doctrine, customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border. Such border searches are grounded in the government's right to protect the nation's territorial integrity by examining persons and property entering and leaving the country. Because searches at the international border of both inbound and outbound persons or property are conducted pursuant to the long-standing right of the sovereign to protect itself, they generally require neither a warrant nor individualized suspicion.

*United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (internal quotations and citations omitted).

The Supreme Court has said that border searches are generally deemed "reasonable simply by virtue of the fact that they occur at the border." *United States v. Ramsey*, 431 U.S. 606, 616 (1977). "This does not mean, however, that at the border 'anything goes.'" *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (*en banc*) (*quoting Seljan*, 547 F.3d at 1000). Even at the border, individual privacy rights are not abandoned, but rather must be balanced against the sovereign's interests in conducting the search. *Cotterman*, 709 F.3d at 960. However, that balance is "qualitatively different" than in the interior of the United States and is "struck much more favorably to the Government." *Id.* Nevertheless, "the touchstone of the Fourth Amendment analysis remains reasonableness. The reasonableness of a search and seizure depends on the totality of the circumstances, including the scope and duration of the deprivation." *Id.*

For instance, in *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), the Supreme Court acknowledged that there may be border searches that are so intrusive, destructive or offensive that they would be deemed unreasonable under the Fourth Amendment. However, in that case, the Court concluded that the warrantless border search of an automobile which included the removal and disassembly of the car's gas tank was lawful despite the lack of reasonable suspicion. *Id.* By contrast, in *United States v. Montoya de Hernandez*, 473 U.S. 531, 541 (1985), the Supreme Court held that reasonable suspicion was required to detain at the border and search the alimentary canal of a traveler thought to have ingested balloons filled with narcotics.

Here, unlike *Montoya de Hernandez*, the border searches of the defendant (*i.e.*, the pat down of his outer clothing) and his sister (*i.e.*, the search of her purse) were not so intrusive, destructive, or offensive as to be unreasonable under the Fourth Amendment. Moreover, the searches in this case were far less intrusive than in *Flores-Montano* where the Supreme Court held that reasonable suspicion for the border search was not required even though law enforcement basically took apart the vehicle to conduct the search. In fact, as explained by the Ninth Circuit in *Seljan*, the searches in this case were rather routine given the statutory duties that customs officers are charged with carrying out at the border.

In *Seljan*, the Ninth Circuit addressed the reasonableness of a border search conducted by customs inspectors conducting an outbound currency interdiction operation targeting packages sent to the Philippines. 547 F.3d at 999. While that is not the precise situation here, the court's reasoning in *Seljan* is instructive. The court first noted that under 18 U.S.C. § 5316, a report must be filed with the Secretary of the Treasury whenever a person transports, or is about to transport, monetary instruments worth more than $10,000 into or out of the United States. *Seljan*, 547 F.3d at 1001. Moreover, the court noted that the outbound interdiction operation was authorized by 31 U.S.C. § 5317(b), which provides that to ensure compliance with section 5316, "a customs officer may stop and search, at the border and without a search warrant, any vehicle, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States." *Id.* The court held that aside from this statutory authority to stop and search, the government had the authority to search at the border "based on its inherent sovereign authority to protect its territorial integrity." *Id.* The court reasoned that the government's authority to conduct border searches is justified by its interest regulating the flow of persons and property across the border, which included "an obvious interest in enforcing section 5316." *Id.* As such, the court concluded that the border search was not unreasonable.

The case at hand is similar to *Seljan* in that the customs inspectors had both statutory authority and authority under the border search doctrine to stop and search the defendant, his sister, their vehicle, and all containers in that vehicle as they were leaving the United States to ensure compliance with section 5316. No suspicion was needed to conduct the search of the purse or the pat down and, as noted earlier, the manner in which these searches were conducted was not unreasonable given that neither the search of the purse nor the pat down of the defendant was intrusive, destructive, or offensive. Even if Agent Bun did grab the purse from the juvenile's lap and did not ask for her consent to search, that behavior was, at most, rude, but not offensively unreasonable under the Fourth Amendment. Likewise, the pat down of the defendant's outer clothing, which is always done for officer safety reasons, was also not intrusive or offensive, even though the agent did not ask for the defendant's

permission to conduct a pat down.

For all of these reasons, the undersigned recommends that the District Court deny the motion to suppress evidence.

## C.    Motion to Suppress Statements

The defendant moves to suppress the post-Miranda statements he made following his arrest. The defendant contends that suppression is warranted because his waiver of Miranda rights was not voluntary for two reasons: (1) Agent Barajas threatened his sister with criminal prosecution if the defendant did not speak with law enforcement; and (2) he was emotionally distraught both by the comments made by CBP officers about his skin condition and CBP officers telling his sister about his skin condition. The government argues that the defendant's statement was voluntary because: (1) Agent Barajas explained the defendant's Miranda rights to him and the defendant stated that he understood those rights and wanted to speak to the agent without a lawyer present; (2) the defendant read the Miranda rights waiver form, placed his initials by each right that was explained to him, and signed the form indicating that he understood all of his rights and was willing to speak with Agent Barajas; and (3) the audio recording of the defendant's interview does not evidence that the defendant was forced to speak to law enforcement based on the alleged threats about his sister or the alleged belittling comments about his skin condition.

"The Constitution demands that confessions be made voluntarily. A confession is involuntary if coerced either by physical intimidation or psychological pressure." *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). A confession is *per se* involuntary if it was accompanied by physical violence. *Haswood*, 350 F.3d at 1027. There is no allegation here that law enforcement used physical or threatened violence. In cases involving allegations of psychological coercion, such as this one, a court looks "to the totality of the circumstances surrounding a confession." *Id.* However, totality of the circumstances does not include a "talismanic definition" of voluntariness. *Id.* Courts look at the following factors to determine voluntariness: the age of the accused; his or her intelligence; the lack of any advice of constitutional rights; the length of detention; repeated and prolonged questioning; and the

1   use of physical punishment, including the deprivation of food or sleep. *Id.* Ultimately, in

2   applying these factors, a court must determine if  law enforcement overbore the accused's

3   will when s/he confessed. *Id.*

4          Here, the defendant was 23 years old, completed the 11th grade, and spoke and read

5   English fluently. (4/22/16 Tr. at 15, 22; Exhibit 1). Thus, he was neither especially young,

6   uneducated, or illiterate. Moreover, the defendant testified that he was aware of Miranda

7   rights generally because his mother has worked with lawyers for many years. *Id.* at 10. The

8   defendant read through the Miranda rights form and had no questions about his rights.  The

9   defendant initialed and signed the form indicating that he both understood his rights and

10   wanted to waive his rights and speak with Agent Barajas.  He also told Agent Barajas that

11   he understood his rights and wanted to waive them and speak with law enforcement. There

12   was no use of physical punishment, as the defendant testified that Agent Barajas provided

13   him with some crackers and a drink. *Id.* at 23. The entire interview lasted a little over an

14   hour, so it did not involve repeated or prolonged questioning. The defendant was detained

15   for a little over three hours from the time he arrived at the Port of Entry (approximately 3:30

16   p.m.) until the start time of his interview (6:45 p.m.). This length of detention was not

17   unreasonable given that Agent Barajas had to drive to the Port of Entry from his office, speak

18   with the CBP officers involved in the apprehension to gather the facts that led to the

19   defendant's arrest, and wait for the officers to count the substantial quantity of currency

20   seized from the defendant and his sister (to indeed verify that the defendant had more than

21   $10,000 to declare).

22          All of the factors discussed above support the government's argument that the

23   confession was voluntary. Indeed, the defendant does not focus on these factors, other than

24   perhaps the defendant's youth and the prolonged detention prior to the interview. Rather, the

25   defense again focuses on the alleged mistreatment of the defendant and his sister by law

26   enforcement: snatching the purse from the juvenile's lap; failing to immediately identify his

27   sister as a juvenile; handcuffing his juvenile sister and placing her in a cell; the humiliating

28   comments made by officers about his skin condition and telling his sister about that

condition; and the alleged threat made by Officer Barajas -- which occurred during a 5-10 minute unrecorded conversation prior to the advisal of Miranda rights -- that if the defendant did not talk, then his sister would face similar consequences. The defendant argues that all of these facts establish that his will was overborne and that he only waived his rights and agreed to speak with Agent Barajas because he wanted to protect his sister -- something he could not do when agents belittled him in front of his sister, told her of his skin condition, and asked her if she had the same condition.

Both the audio recording of the defendant's interview and the testimony at the evidentiary hearing establish that the defendant was undoubtedly concerned about his sister, both in terms of her finding out about his medical condition and whether she was going to be searched, interviewed, and charged with a crime. And it is likely that the defendant spoke with Agent Barajas, in part, because he thought he could help his sister; specifically, so she would not be charged with a criminal offense. However, there is no evidence that the defendant's concern for his sister stemmed from any threats made by Agent Barajas, or that the defendant's will was overborne by his short conversation with Agent Barajas about his sister prior to the advisal of Miranda rights.

The defendant never testified that Agent Barajas explicitly threatened his sister with criminal prosecution if the defendant did not speak with him. Rather, the defendant testified that "if I didn't pretty much talk to them, that my sister would be facing the same thing that I'll be facing."[5]  Defense counsel then asked the defendant to clarify what he meant by the phrase "pretty much." The defendant testified, "[i]t's just my way of saying - his way of saying that if I don't talk to them, I mean,  my sister's getting the same treatment that I'll be getting." No testimony was elicited to clarify what the defendant meant by the phrase "the

---

[5]  The audio recording of the defendant's interview does reflect that Agent Barajas told the defendant that his sister may be facing the same federal charges.  However, Agent Barajas also told the defendant that he did not yet know what was going to happen to either of them in terms of criminal charges being filed.   The defendant challenged Agent Barajas, albeit not defiantly, about how his sister could be charged when she did not have over $10,000 in her purse.  (Exhibit 1.)

same treatment." At the time of this purported conversation, the defendant had been subjected to a thorough pat down and was under arrest, but he had not yet been charged with a crime. The defendant knew that his sister had already been arrested and was in a holding cell. Thus, the "same treatment" could, at most, only refer to a thorough pat down search (which may have already been done at this time) and possibly an interview with law enforcement. The "same treatment" that the defendant's sister would receive was hardly a threat, but rather an explanation of what was going to happen to his sister regardless of whether the defendant spoke with law enforcement.

Indeed, Agent Barajas testified that he did not threaten to charge the defendant's sister with a crime if the defendant did not cooperate. He merely explained to the defendant that he was conducting an investigation and that he would need to speak with the defendant's sister. In fact, the defendant asked Agent Barajas during the recorded interview what was going to happen to his sister, and Agent Barajas explained that his investigation was ongoing and that he would need to speak with her. (Exhibit 1.) The defendant testified that at no time during the recorded interview did he refer to Agent Barajas's alleged prior threats. If those threats occurred, then surely the defendant would have questioned why Agent Barajas was going to subject his sister to this "same treatment" now that the defendant had spoken to Agent Barajas and confessed to this crime. The Court finds that no threats occurred and that the defendant's will was not overborne by his conversation with Agent Barajas about what would happen to the defendant's sister. Rather, the Court finds that the defendant spoke to Agent Barajas because he indeed wanted to help his sister, but that decision was voluntary.

Finally, there is no evidence that the defendant's will was overborne by how his sister had already been treated by CBP officers or the humiliating comments made by one or more CBP officers. Given that the defendant allegedly concealed more than $76,000 on his body and in his sister's purse when attempting to exit the United States, and then falsely declared that he had no currency to report, it was not unreasonable for officers to search, handcuff, and then detain his sister based on her suspected involvement in this offense. It was no doubt distressing to the defendant to witness these events, but it was a natural consequence of the

suspected criminal activity discovered by law enforcement, and did not overbore the defendant's will.

Clearly the inappropriate comments made by CBP officers about the defendant's skin condition were not a natural consequence of suspected criminal activity, but these comments did not influence the defendant's decision to speak with Agent Barajas. The defendant never testified that these insensitive comments impacted his decision of whether to waive his rights and speak with law enforcement. Rather, he testified that his decision to speak with agents stemmed from his concern about what was going to happen to his sister. Thus, while he was hurt and embarrassed by these comments, his will was not overborne by them, either alone or in combination with the other factors the defense claim make his statement involuntary.

Accordingly, the undersigned recommends that the District Court deny the motion to suppress statements.

**V.     Recommendation**

For the foregoing reasons, the undersigned recommends that the District Court issue an order denying the defendant's motion to dismiss the indictment based on outrageous government conduct (Doc. 32) and denying the defendant's motion to suppress statements and evidence (Doc. 31).

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections and Responses to objections filed should be filed as CR 15-01465-TUC-CKJ.  No Replies shall be filed unless leave is granted by the District Court.

DATED this 19th day of May, 2016.

Eric J. Markovich
United States Magistrate Judge