# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>v.<br><br>Arnoldo Saavedra Chavira,<br><br>　　　　Defendant. | No. CR-15-01465-001-TUC-CKJ (EJM)<br><br>**ORDER** |

On July 16, 2015, Defendant was arrested at the Nogales, Arizona Port of Entry and charged with bulk cash smuggling in violation of 31 U.S.C. § 5332. (Doc. 1.) Defendant's juvenile sister was with him in the vehicle at the time of the stop. On August 12, 2015, Defendant was indicted on two-counts: violations of 31 U.S.C. § 5332 (Bulk Cash Smuggling) and 31 U.S.C. § 5324 (Evading Reporting Requirements).[1] (Doc. 12).

Thereafter, Defendant filed a Motion to Suppress Statements and Evidence and a Motion to Dismiss the Indictment for Outrageous Government Conduct. (Docs. 31, 32.) The matter was referred to Magistrate Judge Eric J. Markovich, and an evidentiary hearing was held on April 14 and April 22, 2016. Magistrate Judge Markovich issued a Report and Recommendation (R & R) on May 19, 2016, recommending denial of both motions. (Doc. 68.) Defendant filed his objections and the Government filed its response. (Docs. 73, 75.)

---

[1] The indictment also contained a forfeiture allegation against the currency seized at the time of the defendant's arrest. The juvenile sister was never charged.

The Court has reviewed the Motion to Suppress and the Motion to Dismiss (Docs. 31, 32), the government's responses (Docs. 37, 38), the R & R (Doc. 68), the hearing transcripts from April 14 and 22, 201 (Docs. 52, 58), Defendant's audio-taped interview, Defendant's objections to the R & R (Doc. 58), and the government's response (Doc. 61). The Court will overrule the objections, adopt the R & R, and deny the Motions.

## I.     Background

Defendant's Motion to Dismiss the Indictment for Outrageous Government Conduct is based on the treatment that he and his juvenile sister allegedly received from the federal agents both before and after the arrest. (Doc. 32.) Defendant claims that government agents violated the Juvenile Delinquency Act ("JDA") by detaining his sister for a prolonged period of time without advising her of her legal rights and immediately notifying her parents that she was in custody for an alleged offense. He also claims that agents threatened to charge his juvenile sister with a crime if he did not speak to law enforcement and that U.S. Customs and Border Protection ("CBP") officers humiliated him both by telling his sister about his private medical condition and by making fun of his medical condition.

The Motion to Suppress alleges that Defendant's statements to law enforcement were involuntary because Defendant was coerced into waiving his rights by the threat to charge his juvenile sister and by the agents' violation of his sister's rights under the JDA. (Doc. 31). The Motion to Suppress also alleges that the search of the juvenile's purse and the pat down of Defendant were unreasonable under the Fourth Amendment because law enforcement did not have probable cause or a reasonable suspicion that Defendant and/or his sister were engaging in criminal activity at the time of the stop or initial searches.

At the evidentiary hearing, the government called CBP Officer Sony Bun; CBP Officer Adrian Morales; and Border Patrol Agent Julio Barajas. The defense called Defendant's juvenile sister; Defendant's mother, Leticia Saavedra; and Defendant. The R & R summarizes the testimony of the witnesses, and this Court will not repeat the summaries here. (Doc. 68 at 3-11.) The Court notes there is no dispute that on July 16,

1    2015, Defendant and his juvenile sister were in a vehicle attempting to leave the United
2    States and enter the Republic of Mexico at the Nogales Port of Entry.  Officer Bun, who
3    was working the outbound vehicle lane at the port of Entry, waved for Defendant to stop
4    his vehicle and asked Defendant if he or the female passenger had any weapons,
5    ammunition, or currency in excess of $10,000 to declare. Defendant denied that he and
6    the juvenile accompanying him had any of these items, including more than $10,000 in
7    currency in their possession or in their vehicle. There is also no dispute that Bun had not
8    received a tip to watch for someone transporting money and that there was nothing
9    suspicious about Defendant or his vehicle.

10   Officer Bun noticed that the female in the passenger seat had a purse either on her
11   lap or on the floor.  According to Bun, he asked for consent to search the purse and it was
12   handed to him; according to Defendant and his sister, Bun simply took the purse from
13   her.   He opened the purse and found two sealed envelopes. When he asked what it was,
14   Defendant responded that it was money.  Bun requested identification from both
15   Defendant and the juvenile; they both provided their passports and were referred to the
16   secondary inspection area.

17   At the secondary inspection area, Officer Bun gave the passports to his colleague,
18   CBP Officer Adrian Morales, who conducted a pat down of Defendant to check for
19   weapons.  Officer Morales discovered something around Defendant's ankles and inner
20   thigh. When Officer Morales asked what the bundles were, Defendant stated "money."
21   Officer Morales placed Defendant in handcuffs.  Bun testified that he stayed with the
22   juvenile sister in a waiting area for about 30 minutes until a female officer was available
23   to conduct a pat down.

24   Officer Morales brought Defendant into the building at the Port of Entry to
25   conduct a more thorough pat down; he asked Defendant if he was taking any medications
26   or had any medical conditions. Defendant stated that he had a skin rash around his waist
27   area that might be contagious. Officer Morales testified that officers use latex gloves for
28   all thorough pat downs, and he used gloves to conduct the pat down, which revealed

currency bundles tucked into Defendant's socks and shoes and taped around his thighs. Morales conceded that he did not ask for Defendant's consent to perform the pat down and testified that officers routinely conduct such pat downs for officer safety when an occupant exits a vehicle in secondary inspection. There is evidence that the officers made unprofessional comments about Defendant's skin rash and that Defendant's sister heard the comments.

Officer Barajas took a recorded statement from Defendant after reading Defendant his *Miranda* warnings; Defendant said he understood his rights and was willing to speak without counsel. Defendant also signed a form acknowledging receipt of the warnings and that he understood them, and he waived his rights. (Docs. 52, Exs. 1, 5.) Defendant made various statements during the interview. Defendant asserts that prior to the recorded interview and *Miranda* warnings, he had a brief conversation with Barajas as Barajas escorted Defendant from his cell; Defendant claims that Barajas told him that "if I did not-if I didn't pretty much talk to them, that my sister would be facing the same thing that I'll be facing." Barajas denied that he threatened to charge or arrest Defendant's sister and testified that did not recall having a conversation about the sister before the tape recorded was turned on, although he admitted that Defendant may have asked him a question and he answered truthfully.

The search of Defendant and the juvenile's purse revealed more than $76,000.

As noted Magistrate Judge Markovich recommended that this Court deny both motions. He summarized his conclusions as follows:

> Both the motion to suppress evidence and statements and the motion to dismiss the indictment are based on alleged unprofessional conduct of law enforcement, specifically, the alleged mistreatment of the defendant and his juvenile sister by law enforcement officers at the DeConcini Port of Entry. The behavior of some of the law enforcement officers involved in the defendant's arrest may have been rude, impolite, and even childish, but that behavior was not so outrageous as to justify dismissal of the indictment. Similarly, while it would have been courteous to obtain the juvenile's consent to search her purse and to ask the defendant for permission to conduct a pat down of his outer clothing, no consent or permission was

- 4 -

>     required under the border search doctrine. Finally, there is no evidence that the defendant's waiver of rights was involuntary because the defendant was offended by the CBP officers' insensitive comments about his skin condition and/or his (understandable) concerns that his sister was also likely going to be searched, interviewed, and potentially charged with a criminal offense.

(Doc. 68 at 11-12.)

## II. Legal Standard

The Court reviews de novo the objected-to portions of the Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The Court reviews for clear error the unobjected-to portions of the Report and Recommendation. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *see also, Conley v. Crabtree*, 14 F.Supp.2d 1203, 1204 (D. Or. 1998).

## III. Objections and Discussion

### A. Objection regarding recitation of "inconsistent statements"

As noted, the R & R summarizes the testimony of the six witnesses. Defendant complains the R & R cites to inconsistent witness testimony and that Magistrate Judge Markovich did not make a finding regarding what testimony he believed. (Doc. 73 at 2.)

Defendant's first example relates to when during the course of the stop and arrests the government agents determined the age of Defendant's juvenile sister; Defendant notes that the Magistrate Judge concluded that "the government may well have violated the JDA by failing to timely ascertain the age of the defendant's sister. . . ." (*Id*. at 2-3.) But Defendant fails to explain why the conclusion is problematic for him or why a finding as to when the sister's age was determined is relevant to his claims. The R & R finds that Defendant had no standing to assert a JDA violation on behalf of his sister. (Doc. 68 at 13.) Defendant does not cite authority to contradict this or object to this finding, which is the legally significant finding regarding the alleged JDA violation. This Court finds no error as to that issue and overrules the objection.

Defendant's next example of inconsistent statements concern the R & R's summary of Agent Barajas' testimony regarding the recorded interview of Defendant and

1  contact with Defendant that would not have been recorded—a five to ten minute window
2  when they were walking together from the cell. Defendant does not initially explain the
3  significance of these alleged inconsistencies but later in his objections, he argues that
4  Barajas was lying regarding the threat and implies, without stating, that the R & R
5  erroneously concluded that there was no threat to charge the sister if Defendant did not
6  talk to the agents.  (Doc. 73 at 7-9.)  Because the claim of the threat to prosecute
7  Defendant's sister and the evidence of that claim are central to the remaining objections,
8  the Court addresses the issues here.

Barajas admitted to a short unrecorded conversation but testified that he would not have had an unrecorded ten-minute conversation with Defendant prior to advising him of his *Miranda* rights. Barajas testified that he never threatened to charge or arrest Defendant's sister and did not recall having a conversation about the sister before the tape recorded was turned on, although he admitted that Defendant may have asked him a question and he answered truthfully.[2] Defendant claimed to have had a five to ten minute unrecorded conversation where the Agent said, "if I did not-if I didn't pretty much talk to them, that my sister would be facing the same thing that I'll be facing." (Doc. 73 at 3; ref. R & R at 10.)

First, the Court does not believe that Barajas' testimony is inherently contradictory. Second, as the R & R points out, "[D]efendant never testified that Agent Barajas explicitly threatened his sister with criminal prosecution if the defendant did not speak with him," . . . and "[n]o testimony was elicited to clarify what the defendant meant by the phrase 'the same treatment.'" The R & R further states:

> At the time of this purported conversation, the defendant had been subjected to a thorough pat down and was under arrest, but he had not yet been charged with a crime. The defendant knew that his sister had already been arrested and was in a holding cell. Thus, the "same treatment" could,

---

[2] Specifically, Barajas testified that during his unrecorded conversation with Defendant, Barajas mentioned that Defendant's sister could be facing charges. (Doc. 52 at 75.)

- 6 -

>at most, only refer to a thorough pat down search (which may have already been done at this time) and possibly an interview with law enforcement. The "same treatment" that the defendant's sister would receive was hardly a threat, but rather an explanation of what was going to happen to his sister regardless of whether the defendant spoke with law enforcement.

(Doc. 68 at 20.) Later the Magistrate Judge wrote "[t]he Court finds that no threats occurred. . . ." (*Id.*) In other words, Magistrate Judge Markovich, who heard the witnesses testify, found no threat by Barajas to prosecute Defendant's sister if Defendant did not speak to the agents. The Magistrate Judge implicitly found Barajas' testimony credible and Defendant's testimony insufficient to overcome the denial of a threat. This Court declines to overturn the Magistrate Judge's credibility determination. *See United States v. Thoms*, 684 F.3d 893, 903 (9th Cir. 2012) (holding that a district court abuses its discretion when it reverses a magistrate judge's credibility determinations, made after receiving live testimony and favorable to the government, without viewing key demeanor evidence, with one exception: where the district judge finds that the magistrate judge's credibility determinations had no legally sufficient evidentiary basis.) Having reviewed the record and found sufficient basis for the finding, the Court overrules the objection.[3]

    **B.**    **Objection regarding the constitutionality of the stop and searches**

Defendant asserts in his Motion to Suppress that the currency seized from him and his sister should be suppressed because the pat down of his outer clothing and the search of his sister's purse were not consensual and the agents did not have probable cause or reasonable suspicion to conduct those searches.

The R & R discusses the border-search doctrine, noting that border searches are generally deemed "reasonable simply by virtue of the fact that they occur at the border," *United States v. Ramsey*, 431 U.S. 606, 616 (1977). (Doc. 68 at 14-17.) As the R & R notes:

---

[3] The Court also listened to the audio interview and concurs with the Magistrate Judge's characterization of that interview, which noted that Defendant did not say anything about a threat to his sister. (Doc. 68 at 20, Ex. 1.)

- 7 -

> The border search doctrine is a narrow exception to the Fourth Amendment prohibition against warrantless searches without probable cause. Under this doctrine, customs officials may conduct searches at the international border to identify the illegal transportation of contraband or undeclared articles across the border. Such border searches are grounded in the government's right to protect the nation's territorial integrity by examining persons and property entering and leaving the country. Because searches at the international border of both inbound and outbound persons or property are conducted pursuant to the long-standing right of the sovereign to protect itself, they generally require neither a warrant nor individualized suspicion.

(Doc. 68 at 14, *citing United States v. Seljan*, 547 F.3d 993, 999 (9th Cir. 2008) (internal quotations and citations omitted).)  The R & R also briefly discusses 31 U.S.C. § 5317(b), which provides that to ensure compliance with section 5316, "a customs officer may stop and search, at the border and without a search warrant, any vehicle, aircraft, or other conveyance, any envelope or other container, and any person entering or departing from the United States."  (Doc. 68 at 16.)

The R & R correctly observes that although border searches are generally deemed reasonable that does not mean that at the border "anything goes'"; individual privacy rights are not abandoned at the border. *United States v. Cotterman*, 709 F.3d 952, 960 (9th Cir. 2013) (en banc) (quoting *Seljan*, 547 F.3d at 1000).  Indeed, in *Flores-Montano*, the Supreme Court suggested that even in border cases, where there is a highly intrusive search of the person, some level of suspicion might be required.  541 U.S. 149, 152 (2004).  "[T]he touchstone of the Fourth Amendment analysis remains reasonableness. The reasonableness of a search and seizure depends on the totality of the circumstances, including the scope and duration of the deprivation." *Cotterman*, 709 F.3d at 960.

Defendant argues in his objections that officers were required to have reasonable suspicion to stop and search the vehicle, to search his sister's purse, and to conduct the pat down of Defendant's outer clothing (Doc. 73 at 5); that 31 U.S.C. § 5317(b) is unconstitutional (*id.* at 4-5); and that the Magistrate Judge failed to rule on the

- 8 -

constitutionality of the initial stop (*id.* at 5). These objections are without merit and are overruled.

"Congress, since the beginning of our Government, 'has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.'" *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004), citing *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). Defendant cites no authority supporting a need for reasonable suspicion for the search. His only citation is to *United States v. Nates*, where the Ninth Circuit Court of Appeals upheld the constitutionality of a prior version of 31 U.S.C. § 5317(b). 831 F.2d 860, 863 (9th Cir. 1987). That version permitted a customs officer to conduct a search without a search warrant. *Id* at 862. In upholding the constitutionality of that version of § 5317(b), the court wrote:

> Although the Ninth Circuit has not expressly addressed the constitutionality of § 5317(b), prior precedent effectively forecloses the issue. <u>The border search exception to the fourth amendment, which allows a search to be initiated without a warrant, probable cause or articulable suspicion, applies to exit searches. . . . [internal citations omitted] This circuit holds that a suspicionless exit border search is constitutional.</u> *A fortiori*, § 5317(b), requiring reasonable cause, is also constitutional.

(*Id.* (emphasis added).) In other words, Defendant's cited authority does not support a claim that reasonable suspicion was required for the search, and contrary to Defendant's argument, there is no "tension" between the statute and an individual's Fourth Amendment rights. (*See* Doc. 73 at 6.)

Turning to the pat down of Defendant and search of the sister's purse, the Magistrate Judge wrote:

> the manner in which these searches were conducted was not unreasonable given that neither the search of the purse nor the pat down of the defendant was intrusive, destructive, or offensive. Even if Agent Bun did grab the

- 9 -

>purse from the juvenile's lap and did not ask for her consent to search, that behavior was, at most, rude, but not offensively unreasonable under the Fourth Amendment. Likewise, the pat down of the defendant's outer clothing, which is always done for officer safety reasons, was also not intrusive or offensive, even though the agent did not ask for the defendant's permission to conduct a pat down.

(Doc. 68 at 16-17.) In his Objections, Defendant states that he disagrees with this conclusion but cites to no factual error regarding the intrusiveness or offensiveness of the searches and offers no legal authority to suggest that the intrusions were unreasonable. (Doc. 73 at 5.)

Thus, Magistrate Judge Markovich, in fact, ruled on the constitutionality of the stop and the searches when he wrote "the customs inspectors had both statutory authority and authority under the border search doctrine to stop and search the defendant, his sister, their vehicle, and all containers in that vehicle as they were leaving the United States to ensure compliance with section 5316" and found the searches to be reasonable. (Doc. 68 at 16.) This Court agrees with those conclusions and overrules these objections.

### C. Objection regarding waiver of *Miranda* rights

Defendant moves to suppress the post-Miranda statements he made following his arrest on the grounds that his waiver of *Miranda* rights was not voluntary because Agent Barajas threatened his sister with criminal prosecution if Defendant did not speak with law enforcement, and he was emotionally distraught both by the comments made by CBP officers about his skin condition and CBP officers telling his sister about his skin condition. (Doc. 31.) The government argues that Defendant's statement was voluntary because Agent Barajas explained Defendant's *Miranda* rights to him and Defendant stated that he understood those rights and wanted to speak to the agent without a lawyer present and Defendant read the *Miranda* rights waiver form, placed his initials by each right that was explained to him, and signed the form indicating that he understood all of his rights and was willing to speak with Agent Barajas. Moreover, the audio recording of Defendant's interview does not show that Defendant was forced to speak to law

- 10 -

1 enforcement based on the alleged threats about his sister or the alleged belittling
2 comments about his skin condition.

3 The prosecution may not use statements obtained by custodial interrogation of a
4 defendant unless the government demonstrates the use of procedural safeguards effective
5 to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 444
6 (1996). Once the government establishes that the warnings were given, it must be
7 established that a "waiver [was] made voluntarily, knowingly, and intelligently." *Id.*

8 To determine voluntariness of a confession, a court must consider "whether, under
9 the totality of the circumstances, the challenged confession was obtained in a manner
10 compatible with the requirements of the Constitution." *United States v. Bautista-Avila*,
11 F.3d 1360, 1364 (9th Cir. 1993) (citations omitted); *see also Schnekloth v. Bustamonte*,
12 412 U.S. 218, 226 (1973).  Defendant agrees with the R & R that courts look at factors
13 such as the age of the accused, lack of education, low intelligence, the absence of any
14 advice regarding the accused's constitutional rights, the length of the detention, the
15 repeated and prolonged nature of the questioning, and the use of physical punishment,
16 such as the deprivation of food or sleep, to determine if law enforcement officers elicited
17 a voluntary confession. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

18 In his objections, Defendant essentially concedes that the above-listed factors
19 weigh in favor of the government (Doc. 73 at 9-10), but he argues that in addition to the
20 listed factors, the Court should consider the inappropriate behavior that coerced
21 Defendant into talking to officers, including the threat to Defendant's sister and the delay
22 in determining her age or acting on the determination.  (Doc. 73 at 7-8.)  This Court has
23 already determined to adopt the R & R conclusions that no threat was made and that the
24 Defendant has no standing to assert possible JDA violations as to his sister.    Defendant
25 also suggests that the inconsistencies and possible outright lies in testimony regarding
26 determining the sister's age and derogatory comments about Defendant's skin condition
27 should be included in the totality-of-the-circumstances analysis.  He cites no authority for
28 this, and the Court has already found that Barajas' testimony is not inconsistent.

The objections also note that the R & R focuses on the audio recording of Defendant's interview. The R & R finds:

> defendant's demeanor during the interview was calm until the defendant told Agent Barajas about the comments. (Exhibit 1.) The defendant was clearly upset by the comments, as he broke down and cried when describing the comments to Agent Barajas. However, the defendant was also upset about his skin condition generally, his family finding out about his skin condition, his legal situation, and about whether his sister might be charged with an offense. Id. After he composed himself, the defendant's demeanor was again calm and his will was not overborne as a result of the comments.

(Doc. 68 at 14.) The R & R also states:

> Both the audio recording of the defendant's interview and the testimony at the evidentiary hearing establish that the defendant was undoubtedly concerned about his sister, both in terms of her finding out about his medical condition and whether she was going to be searched, interviewed, and charged with a crime. And it is likely that the defendant spoke with Agent Barajas, in part, because he thought he could help his sister; specifically, so she would not be charged with a criminal offense. However, there is no evidence that the defendant's concern for his sister stemmed from any threats made by Agent Barajas, or that the defendant's will was overborne by his short conversation with Agent Barajas about his sister prior to the advisal of Miranda rights.

(*Id.* at 19.)

Defendant does not object to the R & R characterization of the circumstances of the interview; rather, he argues that the Magistrate Judge should have focused on the inconsistent testimony and unrecorded conversation—i.e. the threat. (Doc. 73 at 8.) The Court has already overruled those objections. The Court adopts the R & R conclusion that the waiver of *Miranda* rights was voluntary.

**D.     Objection that officer's statements resulted in confusion and the warning was not sufficient under Miranda.**

Defendant argues that he had to distinguish between the agent's threat that his

- 12 -

sister would face criminal prosecution and the *Miranda* warning right to remain silent. (Doc. 73 at 10-11, citing *United States v. San Juan-Cruz*, 314 F.3d 384, 387 (9th Cir. 2002).) In *San Juan-Cruz*, the Ninth Circuit invalidated the *Miranda* warnings because the detainee was first read his Administrative rights which informed him that he had the right to have an attorney present during questioning but "not at the [G]overnment's expense."

Here, the Magistrate Judge found that no threat was made. For the reasons previously stated, the Court will adopt this finding. Therefore, this argument fails and the objection is overruled.

### E. Objection regarding outrageous government conduct

Defendant moves to dismiss the indictment based on outrageous government conduct; specifically, the JDA violations committed by the CBP officers in their arrest and detention of Defendant's sister and the humiliating treatment the defendant received when he told officers of his skin condition. The government argued that Defendant has no standing to assert a violation of the JDA and that Defendant was more upset by the medical condition itself than the comments made by the officers. The R & R sets forth the standard for determining outrageous government conduct, and Defendant does not dispute that standard in his objections.[4] Rather, he reasserts his arguments regarding the

---

[4] Outrageous government conduct occurs when the actions of law enforcement officers or informants are "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–432 (1973). "[T]he [g]overnment's conduct must be so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Hullaby*, 736 F.3d 1260, 1262 (9th Cir. 2013), quoting *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). This is "an extremely high standard." *Smith*, 924 F.2d at 897. In fact, there have been only two reported federal appellate decisions in the entire country that have reversed convictions because of "outrageous government conduct." *Hullaby*, 736 F.3d at 1262 (citing *United States v. Twigg*, 588 F.2d 373 (3rd Cir.1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir.1971)). Here, the agents' conduct was not "so grossly shocking and so outrageous as to violate the universal sense of justice," see *Hullaby*, 736 F.3d at 1262, and does not come close to the objectionable conduct in *Twigg* or *Greene*.

- 13 -

prolonged detention of Defendant's sister after agents determined or should have determined her age. (Doc. 73 at 13.) The Court has already ruled that Defendant has no standing to assert violations of the JDA and overrules this objection.

IT IS ORDERED:

(1) Defendant's Motion to Suppress Statements and Evidence (Doc. 31) and Motion to Dismiss the Indictment for Outrageous Government Conduct (Doc. 32) are **denied**.

(2) The R & R (Doc. 68) is **adopted**.

(3) The plea deadline is July 15, 2016, and trial is set for August 2, 2016 at 9:30 a.m. before the Hon. Cindy K. Jorgenson.

Dated this 7th day of July, 2016.

_____
Cindy K. Jorgenson
United States District Judge